IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Nucor Corp., | ) | |
| | ) | C/A No. 2:06-CV-02972-DCN |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER and OPINION** |
| John Bell and SeverCorr, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the court on plaintiff's motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. Specifically, plaintiff seeks a preliminary injunction prohibiting: (1) defendant John Bell from working for SeverCorr; (2) SeverCorr from manufacturing, or preparing to manufacture ultra low carbon (ULC) or interstitial free (IF) steel by use of a vacuum degasser and/or quench process; (3) SeverCorr from hiring employees of Nucor's Berkeley County, South Carolina, mill or from any other Nucor sheet mill operation; and (4) defendants from using, disclosing, or otherwise misappropriating plaintiff's trade secrets and confidential information. For the reasons set forth below, the court grants plaintiff's motion for a preliminary injunction in part and enjoins Bell from participating in SeverCorr's production of IF/ULC steel.

## I.   BACKGROUND

### A.   The Parties

Plaintiff is a steel manufacturer that owns and operates mills in 17 states, including a plant located in Berkeley County, South Carolina ("Nucor-Berkeley"). Nucor-Berkeley is a "mini-mill." A "mini-mill" is a steel manufacturing facility that

converts scrap steel into various marketable steel products, such as sheet steel or rebar. Mini-mills' use of scrap metal as the raw material distinguishes them from "integrated mills," which produce steel products using raw iron ore and pig iron. Operators of mini-mills, like plaintiff, have a competitive advantage over operators of integrated mills (to the extent their product lines overlap) because it is generally less expensive to make steel from scrap than from iron ore and pig iron. Nucor is a publicly-traded corporation that, in 2006, had revenues of approximately $14.75 billion and produced 22.4 million tons of steel. The Nucor-Berkeley mill produced 3.3 million tons of steel in 2006, approximately 180,000 tons of which were IF/ULC steel.

SeverCorr is a start-up steel manufacturer that is building its first (and to-date, only) steel mill in Columbus, Mississippi. The company was organized in 2004 by its principal owners, SeverStal, a Russian steel corporation, and John Correnti, a former President and CEO of Nucor. SeverCorr's mill, like Nucor-Berkeley, is a mini-mill. SeverCorr currently employs approximately 250 people. Construction was scheduled to be finished by the end of 2007, and SeverCorr expects the mill to be fully operational in February 2009. At that time, it will employ 450 people and produce 1.5 million tons of steel annually. The State of Mississippi and other governmental entities have provided subsidies, tax incentives, and other investments to support the SeverCorr mill. The total cost of the mill's construction will exceed $850 million, with total capital contributions exceeding $1 billion.

John Bell is a former employee of Nucor Corporation. In 1987, he began working

for Nucor in a steel mill in Arkansas and became the melt-shop[1] manager at Nucor-Berkeley in 1995. In 2004, plaintiff promoted Bell to the position of General Manager of Steelmaking Technologies. Bell worked in that position until early 2006, when he left Nucor to become SeverCorr's Executive Vice-President and General Manager of Operations. Bell is responsible for overseeing the construction and operation of SeverCorr's mill.

**B.**      **Nucor-Berkeley, Bell, and IF/ULC Steel**

Before describing how Nucor developed its ability to make interstitial-free/ultra low carbon (IF/ULC) steel, an overview of the mini-mill steelmaking process is in order. Production in a mini-mill begins with the collection and sorting of scrap metal.[2] The scrap is placed in an electric arc furnace (EAF), which melts the scrap using a powerful electrical current. After reaching the desired temperature, the molten metal (known as "the heat") is transferred by a ladle into the ladle metallurgy furnace (LMF). Once in the LMF, additions are made to the heat in order to produce the desired chemical composition. The additions vary depending on the heat's starting chemical composition[3] and what steel product is being made from the heat. From the LMF, the heat is poured into a caster that continuously forms the steel into the desired shape. Those shapes

---

[1] The term "melt-shop" generally refers to the area of the steel plant that is responsible for melting the raw material, bringing about the desired chemical properties in the molten steel, and pouring the molten steel into the caster.

[2] Pig iron and iron briquettes are also used, but are more expensive than scrap. For that reason, scrap metal constitutes the primary source of raw material for a mini-mill.

[3] Scrap has more initial impurities than iron ore and these inconsistencies can cause variances in the heat's initial chemical properties.

include slabs, rounds (which are cylindrical), and beams. Some mini-mills, including Nucor-Berkeley and SeverCorr, can produce "thin slab" sheet steel products that are shipped to customers in coils.

Not all steel is equal. Some lower grade steels, which may contain significant impurities, are only suitable for use in construction rebar or for other crude steel products. Some applications require higher grades of steel that are better suited for forming, creasing, and stamping. IF/ULC steel is a very high-end steel that, depending on its quality, is suitable for unexposed or exposed automotive applications. IF/ULC steel is characterized by a lack of undesirable elements, including carbon, nitrogen, sulfur, and hydrogen. Because scrap steel usually contains significant amounts of those elements, it is easier to make the product in integrated mills using iron ore and mini-mills have historically been unable to produce IF/ULC steel on a commercial basis. Plaintiff contends that Nucor-Berkeley is the first mini-mill in the world to produce IF/ULC steel on a commercial basis, and that it is the only mini-mill that currently manufactures and markets IF/ULC steel. SeverCorr plans to produce and market IF/ULC steel for use in unexposed automotive applications by mid-2008. In short, plaintiff contends that the ability to manufacture IF/ULC steel on a commercial basis is the holy grail of the mini-mill business.

Nucor-Berkeley began its quest to manufacture IF/ULC steel in 2002. Bell played a vital role in the events leading to Nucor-Berkeley's success in manufacturing IF/ULC steel. He was heavily involved with the initial decision to manufacture IF/ULC steel, investigated the potential equipment needed to manufacture IF/ULC steel, met with

equipment suppliers, and created reports to justify the equipment purchases. The most critical decision in Nucor's attempt to manufacture IF/ULC steel was the purchase of a $15 million vacuum degasser. Bell described his role as follows:

> I was instrumental, along with Rod Marraccini, . . . basically we came to the conclusion that the Berkeley plant should not have been built. There is no market. You know, there is a . . . 200,000 ton hot roll market in South Carolina, and there is a two and one-half million ton hot roll market in Alabama. There is nothing to the east [of Nucor-Berkeley], except the ocean. There is very little around.
> We decided, look, we are competing with our own plants. We need to do something different. Let's see if we can put in a vacuum degasser; get into auto, motor laminations, low carbon, low nitrogen, interstitial free, and also high carbon.

PI Hrg. Tr. at 411.

At that time, vacuum degassers were rarely, if ever, used in mini-mills. A vacuum degasser enables a steelmaker to adjust the heat's chemical properties under a vacuum, which allows for the subtraction of more chemical elements–including nitrogen, carbon, and sulfur–than can be accomplished by processing the heat at atmospheric pressure. Bell and other Nucor employees approached SMS Demag, a vacuum degasser manufacturer, about the possibility of using a vacuum degasser in conjunction with an EAF and LMF. SMS Demag informed Bell that it could be done and Bell got approval from Dan Dimicco, Nucor's CEO, to make the purchase.

After plaintiff finalized its decision to move forward with the production of IF/ULC steel at Nucor-Berkeley and purchased the necessary equipment, Bell was instrumental in developing a process for manufacturing the product. The parties take widely divergent positions on the level of effort, skill, time, and resources it took to

develop the process for manufacturing IF/ULC steel. Plaintiff argues that Nucor-Berkeley, with Bell leading the effort, undertook extensive trial-and-error testing over several years that resulted the development of a complex process and chemistry model for manufacturing IF/ULC steel in a mini-mill. Defendants disagree, asserting that the basic process of manufacturing IF/ULC steel in a mini-mill was common knowledge and that anyone knowledgeable in metallurgical engineering could develop the process. Moreover, they claim plaintiff obtained much of the information needed to manufacture IF/ULC steel from SMS Demag in connection with the purchase of the vacuum degasser. Defendants also claim the only reason it took Nucor such a long time to make and sell IF/ULC was that heightened market demand for its other steel products encouraged plaintiff to de-emphasize the production of IF/ULC steel. The parties have offered the testimony of experts in steelmaking to support their positions.

No matter what the reason, Nucor did not start making IF/ULC steel on a commercial basis until 2004. While plaintiff contends its long-term goal is to produce IF/ULC steel for use in exposed automotive applications, there are no present plans to do so. SeverCorr currently plans to manufacture IF/ULC steel for use in exposed and unexposed automotive applications.

**C.      Nucor's Alleged "Open Shop" Policy**

Plaintiff claims it took reasonable steps to protect its trade secrets. During his time at Nucor, Bell signed three different confidentiality agreements.[4] It was customary

---

[4]See, e.g., Pl. PI Hrg. Exs. 10, 11. This court held the third confidentiality agreement, which was the only agreement Bell signed that contained a non-solicitation clause, is unenforceable for lack of consideration. See Nucor Corp. v. Bell, 2:06-CV-02972 (D.S.C. filed Jan. 30, 2007).

for plaintiff to require its employees to sign confidentiality agreements, but there is evidence that not every Nucor employee signed a confidentiality agreement. Peter Loomis, the lead hourly employee on Nucor-Berkeley's vacuum degasser, did not sign a confidentiality agreement. Indeed, Loomis stated that—during the time John Bell worked at Nucor—hourly employees were not asked to sign confidentiality agreements.[5] The Nucor-Berkeley employee handbook contains provisions relating to company ownership of information stored on work computers and the confidentiality of personnel files. Bell signed an acknowledgment that he received and read the employee handbook.[6] Visitors to Nucor-Berkeley signed forms at the front gate that contained a confidentiality provision.[7] Independent contractors working with Nucor also signed confidentiality agreements.[8] Plaintiff gave employees, including Bell, exit interviews during which they were advised of their continuing confidentiality obligations.

Despite those efforts, defendants have produced evidence that plaintiff did not take reasonable steps to protect its confidential information. Employees of competing steelmakers frequently toured Nucor-Berkeley, where they viewed plaintiff's IF/ULC production process and the operation of the vacuum degasser. Bell testified that Nucor-Berkeley employees were not instructed that any areas were off-limits to tours or that any competitors' questions could not be answered. Bell describes the steelmaking business as

---

[5] See Loomis Aff. ¶6.

[6] See Pl. PI Hrg. Exs. 18, 19.

[7] See Pl PI Hrg. Ex. 13.

[8] See Pl. PI Hrg. Exs. 15, 16.

an "open" industry where professionals exchange valuable knowledge in hopes of receiving the same in return. According to Bell, plaintiff was even willing to exchange information with its direct competitors. That testimony is supported by the deposition testimony of other former Nucor-Berkeley employees Eugene Pretorius and Rod Marraccini, who stated that Nucor management did not restrict the information that they could give to those taking tours (other than not permitting photographs).[9] Loomis stated that he gave detailed information about the vacuum degasser's operation to people touring the plant.[10] Jeff Powers, the melting/casting manager at Nucor-Berkeley, stated that Nucor "allow[s] people to come into our plants with the assumption that we are going to visit other steel plants and we are going to look at what they do and look at their equipment. And if we can learn something from it, absolutely, we will use it."[11]

Other evidence, including the deposition testimony of Ladd Hall, the Nucor-Berkeley plant manager, supports a conclusion that Nucor employees shielded some information from those touring the plant.[12] Moreover, Dr. Richard Fruehan, plaintiff's expert in steelmaking with an EAF, LMF, and vacuum degasser, testified that simply

---

[9]See Marracini Dep. at 72-73; Pretorius I Dep. at 78-80. They testified that plaintiff only expressly prohibited visitors from taking photographs.

[10]See Loomis Aff. at ¶¶7-12. He stated, "During these visits, representatives of these competing steel companies were allowed to talk with any operator about any aspect of how we made steel. No restrictions were placed on what information could be provided during these visits." Id. ¶11.

[11]PI Hrg. Tr. at 118.

[12]See Hall Dep. at 169-71. Hall testified that his instructions to employees "were very general: Do not give away trade secrets that we've developed on the degasser and be very careful as you take people through the area." Id. at 170.

taking a tour of the plant would not be enough to learn plaintiff's trade secrets:

> When you go on a plant tour, you are getting a cook's tour. You are getting the–you are just going to see in general what a steel plant is doing. You might see the electric furnace in operation. You might see it being tapped. You will see if you have a vacuum degasser or a continuous caster. You really only learn about the process by spending a lot of time with the actual engineers discussing it with them and learning the details of the process itself.[13]

Nucor-Berkeley employees often gave presentations to steelmaking trade organizations on plaintiff's steelmaking practices. Defendants argue those presentations revealed the details of how plaintiff made IF/ULC steel. Defendants primarily point to a presentation that Dr. Paretosh Misra, who worked at Nucor-Berkeley and helped develop its IF/ULC process model, gave to the Association for Iron and Steel Technology.[14] That presentation outlined the general EAF-LMF-vacuum degasser process Nucor-Berkeley uses, and provided specific details of the elemental properties of the heat, including the desired nitrogen, sulfur, and carbon content going into and coming out of the degasser. The presentation also provided details regarding temperature and time. Bell (who the court qualified as an expert in steelmaking) indicated the Misra presentation told a great deal about how to make IF/ULC steel like Nucor-Berkeley, particularly if one understood basic chemistry and steelmaking practices.[15] On the other hand, Fruehan testified the

---

[13]PI Hrg. Tr. at 136.

[14]See Def. PI Hrg. Ex. 6. Powers, Nucor-Berkeley's melting/casting manager, conceded that information given to an AIST meeting would not be considered confidential and that the trade organization's meetings is a public forum. See PI Hrg. Tr. at 102-03.

[15]See PI Hrg. Tr. at 424-30. Bell also testified that plaintiff encouraged its employees to write articles and give presentations about Nucor's steelmaking activities. See PI Hrg. Tr. at 422.

Misra presentation did not disclose plaintiff's processes. He opined that the presentation showed the results Nucor-Berkeley was able to reach, but did not explain how they got there; that the presentation says "we were able to produce steels low in carbon, sulfur and nitrogen. But there is none of the details are required to make this operation work." PI Hrg. Tr. at 156. Defense counsel, however, effectively raised a number of points while cross-examining Freuhan to show the level of detail Misra gave in the presentation and how the presentation disclosed much of the process that plaintiff claims is a trade secret.

Other Nucor-Berkeley employees also gave presentations. On October 11, 2006, Eugene Pretorius made a presentation to the AIST detailing the process for dealing with inclusions.[16] In 2005, Pretorius and Misra made a presentation to a group of steelmakers that discussed the modification of spinel inclusions.[17] Both presentations gave detailed information on the modification of spinel inclusions and stated, <u>inter alia</u>, that Nucor-Berkeley deals with spinel inclusions by injecting calcium via a wire. Those presentations describe one of the processes plaintiff claims is a trade secret. Misra, Pretorius, and Marraccini also wrote an article 2004 on the twin-tank vacuum degasser at Nucor-Berkeley.[18] The article discussed the general process for manufacturing IF/ULC steel and the results Nucor-Berkeley was able to obtain from the degasser.

By pointing to those presentations, defendants have cast doubt upon plaintiff's argument that it took reasonable steps to maintain the secrecy of its proprietary

---

[16] <u>See</u> Def. PI Hrg. Ex. 13.

[17] <u>See</u> Def. PI Hrg. Ex. 14.

[18] <u>See</u> Def. PI Hrg. Ex. 15.

information. Even if plaintiff did not reveal the entirety of its trade secrets, there are serious questions as to whether the information placed in the public domain makes its proprietary information readily accessible.

**D.      SeverCorr and Bell**

John Correnti first approached Bell in 2003 about joining an early venture that would later become SeverCorr. At that time, Bell told Nucor that it was possible he would join Correnti and expressed his interest in running a Nucor mill. In response, Nucor offered Bell the position of General Manager of Steelmaking Technologies and asked him to sign a non-compete agreement. Bell accepted the new position, but he refused to sign the non-compete until he was given the responsibility of running a mill. In 2005, Correnti's venture, which had been organized as SeverCorr, obtained the necessary funding and Bell told Nucor that he had been offered the position as SeverCorr's General Manager of Operations. In response, Nucor gave Bell a promotion to Vice President along with a significant compensation package. Bell stayed at Nucor.

Bell ultimately accepted the position of SeverCorr's Executive Vice President and General Manager of Operations in March 2006. That position entails significant supervisory responsibilities; Bell is in charge of all aspects of the mill's construction and operation, including the purchasing of materials, the manufacture of all steel products, marketing, and human resources. Bell tendered his resignation to Nucor on March 31, 2006. Nucor accepted the resignation effective immediately and plaintiff conducted an exit interview, during which Bell was reminded of his confidentiality obligations. Plaintiff allowed Bell to access the plant to collect his personal effects over the next

several days. Plaintiff argues Bell transferred a substantial number of purportedly confidential Nucor documents from his work computer to a SanDisk thumb-drive and CD, and that he has since used that confidential information at SeverCorr. Defendants admit that Bell downloaded a number of files, but contend that he did so only because of the limited time he had to collect his personal documents, information, and articles. They also argue the documents Bell retained did not include any of plaintiff's trade secrets. After plaintiff began to suspect that Bell took proprietary information, its general counsel sent a letter to Bell informing him that Nucor would take "appropriate action" if he misappropriated trade secrets.[19]

Bell downloaded various Nucor-related documents to the SanDisk thumb-drive device and later viewed those files on his SeverCorr laptop. The facts surrounding the SanDisk are outlined in detail in this court's order granting plaintiff's motion for sanctions. See Nucor Corp. v. Bell, 2:06-CV-02972-DCN (D.S.C. filed Feb. 1, 2008). Bell discarded the SanDisk in late summer 2006. This court has found that the SanDisk contained Nucor-related documents, that Bell looked at those files on his SeverCorr laptop, and that Bell committed spoliation in bad faith by discarding the device. The court also concluded that defendants spoliated evidence by continuing to use Bell's SeverCorr laptop when they anticipated litigation and while this litigation was actually pending.

SeverCorr's mill is very similar to Nucor-Berkeley. SeverCorr's mill will melt scrap in an EAF, refine the heat in an LMF, and use a twin-tank vacuum degasser to

---

[19]Pl. PI Hrg. Tr. at 17.

manufacture high-grade products. The mill will also use a continuous caster, but, unlike Nucor-Berkeley, will not use a quench system.[20] SeverCorr contracted with SMS Demag (before Bell left Nucor) to provide all of the equipment in its melt-shop. SeverCorr contends SMS Demag will provide it with all the information necessary to produce IF/ULC steel. Indeed, SMS has contractually guaranteed that SeverCorr will be able to produce approximately 250,000 tons of IF/ULC steel.[21]

### E.    Bell's Alleged Solicitation of Nucor-Berkeley Employees

Part of plaintiff's allegations concern defendants' "wrongful" solicitation and hiring of Nucor-Berkeley employees. After Bell's resignation, four Nucor-Berkeley employees joined him at SeverCorr. Those employees were Mark Pole, Nucor-Berkeley's day casting supervisor, Tony Gurley, Nucor-Berkeley's day melter, Stan Smith, Nucor-Berkeley's caster maintenance supervisor, and John Campbell, a Nucor-Berkeley vacuum degasser maintenance worker. SeverCorr gave Pole, Gurley, Smith, and Campbell substantial raises, increased responsibilities, and supervisory authority. According to plaintiff, those employees had been heavily involved in Nucor-Berkeley's vacuum degasser trials and therefore have knowledge of its confidential information. When

---

[20]Plaintiff has argued that defendants have misappropriated its trade secrets concerning the quench system. The court does not address these allegations for three reasons. First, there is no evidence that defendants have misappropriated plaintiff's trade secrets relating to the quench, if any. Second, there is no reason to believe that misappropriation will occur in the future because SeverCorr has no plans to use a quench system in its facility. Third, Nucor-Berkeley has substantially modified its quench since Bell's departure.

[21]See PI Hrg. Tr. at 367-68. Notably, and despite SMS's guarantees, Bell's initial contract with SeverCorr guaranteed a bonus of $5 million in equity ownership if he met certain goals. Those goals included the manufacture of steel suitable for exposed automotive applications. PI Hrg. Tr. at 488.

combined with other Nucor employees hired from other plants (who presumably have no IF/ULC expertise), plaintiff argues Bell, based on his knowledge of confidential personnel evaluations and information, cherry-picked its best employees, to help him and SeverCorr in their production of IF/ULC steel.

Defendants argue that shortly after Bell joined SeverCorr, several Nucor employees contacted him and/or SeverCorr about working there. Bell maintains that he did not initiate contact with plaintiff's employees. (Plaintiff has produced no evidence to the contrary.) Moreover, defendants contend the employees who went to work at SeverCorr were at-will employees of Nucor and did not sign non-compete agreements.

## II.  PROCEDURAL HISTORY

Plaintiff filed its complaint in the Court of Common Pleas for Charleston County, South Carolina, on October 6, 2006. Defendants removed the action to this court on October 17, 2006. Plaintiff's amended complaint asserts eleven causes of action against both defendants: (1) misappropriation of trade secrets, (2) breach of contract, (3) breach of the duty of loyalty, (4) computer fraud and abuse, (5) tortious interference with contractual relations, (6) unfair trade practices, (7) civil conspiracy, (8) conversion, (9) unjust enrichment, (10) an equitable claim for imposition of a constructive trust, and (11) a request injunctive relief. The court has issued an order dismissing the breach of contract claim to the extent it relied on the third confidentiality agreement, which contained an express prohibition on soliciting Nucor's employees. See Nucor Corp. v. Bell, 2:06-CV-02972-PMD (D.S.C. filed Jan. 30, 2007).

The parties made cross-<u>Daubert</u> motions with respect to the opposition's computer forensic experts. The court denied plaintiff's motion and granted defendants' motion in part.

Plaintiff also made a motion for sanctions based on defendants' alleged spoliation of electronic evidence. The court granted that motion. First, the court concluded that Bell acted intentionally and in bad faith when he destroyed the SanDisk thumb-drive device that contained Nucor-related documents. The court also concluded that defendants engaged in sanctionable spoliation because of the continued use of Bell's SeverCorr laptop during the pendency of this litigation. Consequently, the court will give the jury an adverse inference charge as a sanction for defendants' wrongful conduct. The jury will therefore be able to decide whether spoliation occurred and, if so, can draw an inference that the evidence would have been unfavorable to defendants.

Plaintiff filed the instant motion for a preliminary injunction on May 10, 2007. Specifically, plaintiff has asked that the court enjoin: (1) Bell from working for SeverCorr, (2) SeverCorr from manufacturing, or preparing to manufacture, IF/ULC steel by use of vacuum degasser and/or quench process, (3) SeverCorr from hiring employees of Nucor-Berkeley or any other Nucor sheet mill; and (4) defendants from using, disclosing, or otherwise misappropriating Nucor's trade secrets and confidential information. The court held an evidentiary hearing on this matter, in addition to considering the parties' written briefs and an ocean of other evidence.

# III.   STANDARD OF REVIEW

Preliminary injunctive relief is an "extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." Direx Israel, Ltd.  v. Breakthrough Medical Corp., 952 F.2d 802, 811 (4th Cir. 1991) (alterations in original) (quoting Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989)). The propriety of preliminary relief is determined according to the hardship balancing test established in Blackwelder Furniture Co. v. Seilig Manufacturing Co., 550 F.2d 189, 195 (4th Cir. 1977). Under that test, the court must consider four factors: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. Direx, 952 F.2d at 812. The plaintiff bears the burden of proving that each factor supports granting the requested relief. Id.

Of the four factors, the first two are the most important. Id. "[T]he required 'irreparable harm' must be 'neither remote nor speculative, but actual and imminent.'" Id. The plaintiff must therefore make a "clear showing" of irreparable harm. Id. Once the court is satisfied that the plaintiff has made a clear showing of irreparable harm, the court must then balance the likelihood of irreparable harm to the plaintiff against the likelihood of harm to the defendant. Id. "If, after balancing those two factors, the balance 'tips decidedly' in favor of the plaintiff," the plaintiff need only raise "questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." Rum Creek Coal Sales, Inc. v.

<u>Caperton</u>, 926 F.2d 353, 359 (4th Cir. 1991) (citations omitted). But as the balance tips away from the plaintiff a stronger showing on the merits is required. <u>Id.</u> Accordingly, if the balance of harms does not tip decidedly in plaintiff's favor (e.g., if the relative harms are in equipose), the plaintiff must make a higher showing–"a probability (not mere possibility) of success of the ultimate trial on the merits is required." <u>Direx</u>, 952 F.2d at 812; <u>see</u> <u>Scotts Co. v. United Industries Corp.</u>, 315 F.3d 264, 271 (4th Cir. 2002).

## IV. DISCUSSION

Under the <u>Blackwelder</u> standard, the preliminary injunction analysis begins with a weighing of the parties' relative harms. In this case, plaintiff's ability to show that it will suffer irreparable harm in the absence of injunctive relief is tied to its ability to show a likelihood of success on the merits. Accordingly, the court proceeds directly to an analysis of <u>Blackwelder</u>'s success prong, returning later to the relative harms inquiry.[22]

## A.    Plaintiff's Likelihood of Success on the Merits

To support its request for injunctive relief, plaintiff primarily relies on its claim under the South Carolina Trade Secrets Act, S.C. Code Ann. § 38-8-10 <u>et seq.</u> ("SCTSA" or "the Act"). The Act provides a cause of action to any person who is "aggrieved by a misappropriation, wrongful disclosure, or wrongful use of his trade secret." S.C. Code Ann. § 39-8-30(C). To succeed on a claim under the SCTSA, the plaintiff must generally follow a two-step process of proving that it has a trade secret and proving the defendant misappropriated the trade secret. See <u>Lowndes Prods., Inc. v. Brower</u>, 259 S.C. 322, 327,

---

[22]This approach follows the Fourth Circuit's analysis in <u>Scotts</u>. See <u>Scotts Co.</u>, 315 F.3d at 272.

191 S.E.2d 761, 764 (1972); <u>Williams v. Riedman</u>, 339 S.C. 251, 279, 529 S.E.2d 28, 42 (Ct. App. 2000). Additionally, the Act expressly authorizes the issuance of an injunction to prevent the threatened or actual misappropriation of a trade secret. <u>See</u> S.C. Code Ann. § 39-8-50(A).

### 1.    Whether Plaintiff Had Trade Secrets

"Trade secret" is a defined term under the Act. For information to qualify as a trade secret, it must provide independent economic value, actual or potential, from not being generally known to or readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use. S.C. Code Ann. § 39-8-20(5). Additionally, the information must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." <u>Id.</u> Plaintiff argues that it developed its process for manufacturing IF/ULC steel in a mini-mill only after significant expenditures of time, resources, and manpower. Plaintiff further argues that developing the process required extensive trial and error, and that it derives economic benefit from the process's secrecy. Defendants argue that plaintiff's processes are known in the steelmaking community or are readily ascertainable because its process is a function of established chemical principles. Additionally, defendant contends plaintiff has not undertaken reasonable efforts to maintain the secrecy of its process, which has two implications for this case. First, because plaintiff has not undertaken reasonable steps to maintain the secrecy of its alleged proprietary information, that information cannot meet the definition of a trade secret under S.C. Code Ann. § 38-5-20(5). Second, because plaintiff shared confidential information with other steelmakers, its alleged proprietary

information is either in the public domain or is readily ascertainable using the information that plaintiff placed in the public domain.

Plaintiff has offered substantial evidence that parts of its process for manufacturing IF/ULC steel were not known or readily ascertainable and that plaintiff derives independent economic value from their secrecy.[23] Fruehan's testimony is plaintiff's most important evidence on this issue. Undoubtedly a knowledgeable and well-qualified expert, Fruehan testified that the model Nucor-Berkeley developed is a trade secret and took significant effort to create. He testified:

> What [Nucor-Berkeley] developed is a very sophisticated metallurgical model. The model is based on thermal dynamics. It's based on an energy balance. And it's based on a mass balance. And if you go through the process, there is a lot of competing factors that are occurring. For example, when you add aluminum to steel, it will give off some heat, okay? When you add lime to the steel, it will decrease the temperature. When you add certain things, reactions will occur. So what this model does, it allows the steelmaker to put in the conditions as to what his temperature is, his chemistry is, and it will dictate when and where each addition should be made. It's a very advanced model. And I was very impressed.

PI Hrg. Tr. at 147-48. Fruehan also testified that various pieces of the IF/ULC process are unique to Nucor-Berkeley and not generally known, including processes for reaching the optimum temperature, modifying spinel inclusions, removing nitrogen, removing sulfur, removing phosphorous, and tapping the steel to minimize slag carryover. PI Hrg. Tr. at 143-53. According to Fruehan, Nucor-Berkeley arrived at its model and processes

---

[23]As discussed <u>infra</u>, however, defendants have offered substantial evidence that those secret parts of its process may have become known or readily ascertainable later because of plaintiff's failure to take reasonable steps to protect their secrecy.

through trial and error that took two years and tens of millions of dollars.[24] PI Hrg. Tr. at 142, 169-70.

There is also significant evidence that plaintiff derives independent economic value, either actual or potential, from the secrecy of the information. Fruehan testified that Nucor would be injured if competitors had its trade secrets because this process enables Nucor to offer the same products as integrated mills but at lower prices. See PI Hrg. Tr. at 142. That fact appears to be undisputed: defendants acknowledge that mini-mills manufacture IF/ULC steel less expensively, and can therefore sell IF/ULC steel at lower prices (but with a higher profit margin) than integrated mills. Accordingly, Nucor would lose its competitive advantage over integrated mills if other mini-mills are able to produce IF/ULC steels. Id. at 161-62. Jeff Powers, Nucor-Berkeley's current melting/casting manager, also noted that plaintiff has a two-year head start on mini-mills that decide to manufacture IF/ULC steels, meaning Nucor-Berkeley can continue to improve its technique while its competitors embark on their own trial-and-error process to come up with the basic model. See PI Hrg. Tr. at 78-79.

On the other hand, defendants have made a substantial showing that plaintiff's processes are not trade secrets, either because they are readily ascertainable or because plaintiff failed to take reasonable steps to maintain secrecy. Naturally, there is the rebuttal testimony of John Bell and defendants' expert, Gunther Kaiser, that plaintiff's methods are not unique, and that anyone knowledgeable in steelmaking practices and

_____

[24]Defendants, particularly through Bell's testimony, dispute the amount of trial and error it took plaintiff to develop its IF/ULC steelmaking processes. Even considering all of defendants' evidence, it is this court's conclusion that the process and model for manufacturing IF/ULC steel in a mini-mill, like Rome, was not built in a day.

metallurgical engineering can manufacture IF/ULC steel like Nucor-Berkeley with very little effort. It is likely that parts of Nucor-Berkeley's process are well-known. For example, simple chemistry dictates that adding titanium to the heat will reduce nitrogen and carbon—and that many manufacturers of IF/ULC use titanium for that purpose. See PI Hrg. Tr. at 410. Thus, plaintiff cannot claim that adding titanium is a trade secret. At bottom, and what this example illustrates, is that defendants have offered evidence that some of the process for IF/ULC steelmaking in a mini-mill are derived from well-known scientific facts. That evidence serves to counter some (though perhaps not all) of Dr. Fruehan's testimony on the specific aspects of IF/ULC steelmaking at Nucor-Berkeley.[25]

Based on the evidence defendants presented, it is debatable whether plaintiff took reasonable steps to maintain the secrecy of its information. Bell described Nucor-Berkeley as maintaining an "open shop" policy, resulting in a quid pro quo of information-sharing among steelmakers. See PI Hrg. Tr. at 397-99. He testified that Dan DiMicco, Nucor's CEO, knew of the policy and, even though it "concerned him," the policy continued because Bell "always convinced Dan that [Nucor] received significantly more than [it] gave out." Id. at 398. Plaintiff's competitors frequently toured the Nucor-Berkeley facility, where no area of the mill was off-limits. E.g., id. at 132, 421-22. Other than the confidentiality agreements some employees signed, plaintiff provided minimal instruction to Nucor-Berkeley employees on what information they were allowed to disclose to people touring the mill. See Pretorius I Dep. at 78-80, 134-35; Pretorius II

---

[25]Defendants' argument, however appealing, is belied by the fact that if making IF/ULC steel in a mini-mill were so well-known and so easy, many more mini-mills would be producing IF/ULC steel because it is so profitable.

Dep. at 134-35; Gurley Dep. at 95; Marraccini Dep. at 75-76. Hourly employees did not sign confidentiality agreements, but salaried employees did. Loomis Aff. ¶6. All employees, including hourly employees, had access to Nucor-Berkeley's training manuals, which include detailed explanations of how the facility made steel in the vacuum degasser (i.e., those processes that plaintiff claims are trade secrets). Plaintiff made little effort to keep track of those manuals, they were not stamped as confidential, and plaintiff permitted any employee to take one home. <u>See</u> PI Hrg. Tr. at 96-99, 429-33.

Finally, Nucor-Berkeley employees wrote articles and gave presentations that may have disclosed some of plaintiff's confidential information. Most notable is the presentation Misra gave to the Association for Iron and Steel Technology. Among other information, the presentation gave a detailed explanation of the differences between making IF/ULC steel in a mini-mill versus an integrated mill, as well as the desired chemical properties and temperature parameters at each step. As noted above, defense counsel's examination of Fruehan regarding the Misra presentation demonstrates there are serious questions about plaintiff's ability to claim that the information disclosed by this presentation was innocuous. John Ferriola, one of plaintiff's Rule 30(b)(6) witnesses, testified that one of plaintiff's employees—usually the mill's general manager—reviewed presentations before employees gave them. <u>See</u> Ferriola Dep. at 57-58. Moreover, there is a strong argument that Misra's presentation disclosed enough trade secrets to allow a knowledgeable steelmaker to work backwards from the presentation's information using known chemistry principles to achieve Nucor-Berkeley's results. As the South Carolina courts have noted, "matters that can be disclosed by reverse engineering may not be

protected as trade secrets." <u>Carolina Chem. Equip. Co. v. Muckenfuss</u>, 322 S.C. 289, 296, 471 S.E.2d 721, 724-25 (Ct. App. 1996).

### 2. Whether Defendants Misappropriated Plaintiff's Trade Secrets

"Misappropriation" is also a defined term under the Act, meaning: (1) acquisition of another's trade secret by a person using improper means, or (2) acquisition of a another's trade secret by a person who knows or has reason to know that the trade secret was acquired using improper means. S.C. Code Ann. § 39-8-20(2)(a) & (b). Beyond the mere acquisition of a trade secret, misappropriation includes the disclosure or use of a trade secret when the misappropriator either acquired the secret through improper means or knew or had reason to know that it was acquired through improper means. <u>Id.</u> § 39-8-20(2)(c). Misappropriation can also occur in limited circumstances where the secret was acquired by accident or mistake. <u>See</u> <u>id.</u> § 39-8-20(c)(ii)(B) & (c)(iii).

### a. Defendants' Alleged Use of Plaintiff's Trade Secrets

Plaintiff has not provided sufficient evidence for the court to conclude that defendants have actually used plaintiff's trade secrets. First, SeverCorr contracted with SMS Demag to provide all of the equipment for its mini-mill while Bell was still working at Nucor-Berkeley. PI Hrg. Tr. at 340, 360-62. SeverCorr has changed some of its equipment since hiring Bell, but there is no evidence those changes were made using plaintiff's trade secrets.[26] Pole Dep. II at 50. SMS Demag has provided a contractual "money back" guarantee that SeverCorr will be able to produce IF/ULC steel long before

---

[26]SeverCorr has changed some of its equipment since Bell became General Manager. SeverCorr has made changes to its mould exhaust and rollers on the CSP caster. <u>See</u> Pole Dep. II. at 35-36, 50-52. Neither change involved plaintiff's alleged trade secrets.

SeverCorr hired Bell. PI Hrg. Tr. at 360-62, 368. As part of that guarantee, SMS is providing SeverCorr with manuals that give a general overview of the vacuum degassing process, including desired chemistry and temperatures.[27] Cotchen Aff. ¶¶5 & Ex. 2; see also PI Hrg. Tr. at 519 (Kaiser testifying that an educated steelmaker could make IF/ULC steel based on the manuals SMS provided to SeverCorr).

Second, it is uncontroverted that Nucor-Berkeley's specific model cannot be transferred to SeverCorr. As Fruehan testified, a person cannot memorize the model, and there is no evidence that SeverCorr has otherwise obtained the model. PI Hrg. Tr. at 191. More importantly, the evidence suggests that it is not possible for a steelmaker to wholly rely on another mill's model because every steel plant has to adjust its steelmaking processes to fit its equipment. Pole Dep. II at 111; Pretorius Dep. I at 129-30. Thus, beyond the information SMS provided (or that can be found in publically-available information, such as the Misra presentation), SeverCorr will have to go through its own trial-and-error process to develop its own model.[28]

### b.    Defendants' Alleged Acquisition of Plaintiff's Trade Secrets

John Bell possessed at least three documents related to Nucor-Berkeley's production processes when he went to work for SeverCorr. Plaintiff claims Bell took

---

[27]The information SMS provided is notable because it may provide an alternative, proper means for acquiring some of the information plaintiff contends is a trade secret. See Atwood Agency v. Black, 374 S.C. 68, 646 S.E.2d 882, 884 (2007).

[28]These points address only whether defendants have actually used plaintiff's trade secrets. Defendants may still use plaintiff's trade secrets in the future. For the reasons outlined infra in section IV.B, Bell will inevitably have to disclose or use the proprietary information he learned while working for Nucor in order to perform his job at SeverCorr as it moves closer to the production of IF/ULC steel.

these documents from his Nucor computer shortly after his resignation using a SanDisk thumb-drive and later accessed them on his SeverCorr work computer (although they were apparently never saved onto the SeverCorr computer). See Second Jorgensen Report at 12-13; Bell Dep. at 63-64. These three documents were: (1) an excerpt from Nucor-Berkeley's training manuals on the operation of the vacuum degasser;[29] (2) a presentation on Nucor-Berkeley's vacuum degasser practice;[30] and (3) a document containing Nucor-Berkeley's production costs from December 2003.[31]

Bell downloaded the documents to the SanDisk after he resigned from Nucor, and retained them even after he told plaintiff that he had no more Nucor property. Those circumstances likely qualify as acquisition by "improper means." See S.C. Code Ann. § 39-8-20(1). Because of the adverse inference charge the court will impose as a sanction for Bell's bad faith spoliation of the SanDisk, the jury may find that the thumb-drive contained misappropriated documents. However, whether Bell, and consequently SeverCorr,[32] are liable for misappropriating these documents depends largely on whether

---

[29]Pl. PI Ex. 2; PI Hrg. Tr. at 67.

[30]Pl. PI Ex. 3; PI Hrg. Tr. at 66.

[31]Pl. PI Ex. 8; PI Hrg. Tr. at 81.

[32]SeverCorr's culpability for Bell's misappropriation is largely governed by ordinary agency principles. Plaintiff has offered little, if any, evidence that Bell was acting in the scope of his employment in taking, accessing, or retaining these documents. The only evidence that suggests he was acting on SeverCorr's behalf is that he accessed the documents on his SeverCorr work computer. This is not to say that Bell was not acting on SeverCorr's behalf when he misappropriated plaintiff's trade secrets—only that plaintiff has not yet presented sufficient evidence to find in its favor on the issue.

Beyond agency principles, SeverCorr can be liable on its own accord under S.C. Code Ann. § 39-8-20(2)(b) if it "acquired" plaintiff's trade secrets and knew that Bell obtained them through improper means. There is no evidence that SeverCorr acquired

plaintiff's process is a "trade secret" at all. As to the document concerning plaintiff's cost-of-production figures, plaintiff has not offered evidence that suggests it took reasonable steps to maintain its secrecy, as plaintiff must do to meet the burden of proof. Powers testified only that he considered the figures "confidential" and that he would not want competitors to have them. See PI Hrg. Tr. at 81.

### 3. Alleged Solicitation of Nucor-Berkeley Employees and Trade Secrets

Plaintiff has not presented fair grounds for litigation with respect to defendants' alleged use of trade secrets to solicit Nucor-Berkeley employees. First, it is not clear that plaintiff has demonstrated the information it seeks to protect is a trade secret. Among the information plaintiffs claims is a trade secret are employee wages and the results of employee evaluations. In effect, plaintiff seeks to protect general information about an employee's strengths or weaknesses. Nucor-Berkeley employees did not have a contractual duty to keep their wages or the results of their evaluations confidential. There is also no evidence that plaintiff ever informed employees that such information was confidential. Certainly an individual employee could apply for a job elsewhere, tell the prospective employer how much he made at Nucor-Berkeley, identify his strengths and weaknesses, and reveal the results of his latest evaluations. Moreover, if plaintiff is like the vast majority of employers in this country, it strains credulity to believe that supervisors at Nucor-Berkeley never served as references for employees under their

_____

plaintiff's purported trade secrets; the documents never resided on Bell's SeverCorr laptop, there is no evidence that Bell gave them to anyone else, and there is no evidence that they resided on SeverCorr's network. Moreover, there is no evidence that SeverCorr knew Bell even had the documents, thus there is no evidence that SeverCorr knew Bell obtained them through improper means.

supervision. At bottom, it is difficult to believe—and there is no evidence to suggest—that plaintiff took reasonable steps to maintain the secrecy of this information or that the information was not readily accessible through proper means.[33]

Second, even assuming that this information is confidential or proprietary, plaintiff has offered no evidence that defendants have solicited Nucor-Berkeley employees or otherwise used its purported trade secrets in hiring employees. Charles Furman, SeverCorr's Human Resource Manager, testified that Bell did not make the decision to hire Tony Gurley or Mark Pole, and that he "didn't really" make the decision to hire John Campbell. Furman Dep. at 208. Furman also testified that SeverCorr's practice is to wait for people to approach it about employment—not to affirmatively approach a supervisor's former employees about jobs. Id. at 61-62. Pole testified in his deposition that he approached Bell about working at SeverCorr.[34] Pole Dep. I at 60-63, 66-68, 74-75. Even John Ferriola, Nucor's 30(b)(6) witness on this issue, testified that the only basis for his opinion that defendants "took" Nucor-Berkeley employees was simply that four former Nucor-Berkeley employees were now working at SeverCorr.

---

[33]Bell, Powers, and others identified this information as "confidential" or "proprietary." The information was undoubtedly confidential from the corporation's perspective. For a host of reasons, an employer generally shields employee information from third parties. Nonetheless, to hold that individual employees cannot discuss the specifics of their own job absent an agreement not to do so would run counter to the state's public policy favoring employment mobility. For that reason, even Bell's identification of the evaluations and other information as "proprietary" is not dispositive on the trade secrets issue. The outcome may have been different had plaintiff imposed a confidentiality agreement on individual employees not to disclose the particulars of their own employment.

[34]Pole also believed that he had been fired by Nucor-Berkeley. See Pole Dep. I at 40.

Ferriola Dep. at 218-19. Mark Powers, the melting/casting manager at Nucor-Berkeley, testified that Gurley, Pole and another employee who went to work at SeverCorr said that they initiated contact with Bell. PI Hrg. Tr. at 119-20. Ladd Hall testified that he did not have any "specific" evidence that Bell solicited Nucor-Berkeley employees. Hall Dep. at 260. Based on that evidence, and the lack of evidence to the contrary, plaintiff has failed to demonstrate that there was a misappropriation or improper use of its purported trade secrets with regard to its employees.

### 4.    Plaintiff's Non-Trade Secret Claims

Plaintiff has briefly offered argument on three of its "non-trade secret" claims in support of its motion for a preliminary injunction.

First, plaintiff argues it has shown of likelihood of success on the merits with respect to its breach of contract claim against Bell. On this claim, plaintiff contends that Bell has breached the confidentiality agreements he signed while working at Nucor-Berkeley. Amend Comp. ¶¶51-57. Specifically, plaintiff asserts Bell has breached the agreement by using confidential information in soliciting and hiring Nucor-Berkeley employees. Id. ¶52. For the reasons discussed above vis-a-vis the trade secrets claim, plaintiff has not shown a likelihood of success on this claim.

Second, plaintiff argues it has shown a likelihood of success on its tortious interference with contractual relations claim. Plaintiff alleges defendants interfered with its employees at-will employment "contracts" and induced former Nucor-Berkeley employees to violate their confidentiality agreements.[35] Amend. Comp. ¶¶70-71. To

---

[35]The evidence shows that Bell signed a confidentiality agreement, Pl. PI Exs. 10 & 11, that Nucor-Berkeley's salaried employees generally signed confidentiality

assert a tortious interference claim under South Carolina law, plaintiff must prove: (1) a contract, (2) knowledge of the contract by the tortfeasor, (3) intentional procurement by the tortfeasor of the contract's breach, (4) absence of justification, and (5) resulting damages. <u>Todd v. S.C. Farm Bureau Mut. Ins. Co.</u>, 287 S.C. 190, 336 S.E.2d 472, 473 (1985).

Plaintiff cannot demonstrate a likelihood of success on this claim because it has not shown that defendants acted with the intent to procure the breach. As discussed above, there is no evidence that SeverCorr or Bell solicited employees. In other words, there is no evidence that defendants induced or coerced Nucor-Berkeley employees to leave plaintiff's employment. <u>See</u> <u>Todd v. S.C. Farm Bureau Mut. Ins. Co.</u>, 283 S.C. 155, 164, 321 S.E.2d 602, 608 (Ct. App. 1984), <u>rev'd on other grounds</u>, 287 S.C. 190, 336 S.E.2d 472 (1985). As to the alleged procurement of the breach of the employees' confidentiality agreements, even if plaintiff's former employees breached their confidentiality agreements by accepting jobs with SeverCorr, SeverCorr or Bell must have intended for the employees to do so. There is no evidence (beyond plaintiff's unfounded speculation) that SeverCorr or Bell acted to <u>intentionally</u> procure the breach of those confidentiality agreements (assuming those agreements existed at all)**.**

Finally, plaintiff argues it has shown a likelihood of success on its unfair trade practices claim. To establish a violation of the South Carolina Unfair Trade Practices Act (UTPA), plaintiff must prove, <u>inter alia</u>, that the defendant's wrongful conduct has an

---

agreements, and that Nucor-Berkeley's hourly employees did not sign confidentiality agreements, <u>see</u> Loomis Aff. ¶6. Thus, to the extent the employees who left Nucor-Berkeley to work for SeverCorr were hourly employees, it is unlikely they signed a confidentiality agreement.

adverse effect on the public interest. See Noack Enterprises, Inc. v. Country Corner Interiors of Hilton Head Island, Inc., 290 S.C. 475, 351 S.E.2d 347 (Ct. App. 1986). In Florence Paper Co. v. Orphan, 298 S.C. 210, 379 S.E.2d 289 (1989), the supreme court considered the "effect on the public interest" requirement where a corporation misappropriated a competitor's proprietary client information. The court held the aggrieved party could not bring a UTPA claim in those circumstances, reasoning that a suit involving two competitors did not necessarily implicate the public interest. See id. at 212-13, 279 S.E.2d at 291. As in Florence Paper, the mere (alleged) misappropriation of Nucor's trade secrets or solicitation of its employees are private harms.

Plaintiff contends that defendants' wrongful actions are capable of repetition because it will be harmed every time SeverCorr manufactures and sells IF/ULC steel. A plaintiff satisfies the "effect on the public interest" requirement if it can prove the wrongful conduct is "capable of repetition." Daisy Outdoor Advertising, Inc. v. Abbott, 322 S.C. 489, 493, 473 S.E.2d 47, 49 (1996); Sadighi v. Daghighfekr, 36 F. Supp. 2d 279 (D.S.C. 1999). The Daisy court concluded that a corporation, as a member of the public, is entitled to protection from another's repeated unfair acts. Id. at 497, 473 S.E.2d at 51-52. In this case, plaintiff has not shown a potential for repetition. The wrongful conduct in this case is the alleged misappropriation of trade secrets and/or solicitation of Nucor-Berkeley employees. As an initial matter, since plaintiff failed to produce evidence that defendants solicited plaintiff's employees, it has not shown a likelihood of success on that part of its UTPA claim. As to the misappropriation allegations, even if defendants have misappropriated trade secrets, there is no evidence that they will be able to do so

again in the future. Plaintiff's argument, though superficially attractive, concerns the ongoing harm stemming from a single unfair act of misappropriation. Accordingly, plaintiff has not shown a likelihood of success on its UPTA claim.

**5.     Plaintiff's Overall Likelihood of Success on the Merits**

The above discussion leads to a few conclusions. As an initial matter, plaintiff has offered sufficient evidence to show that its IF/ULC production process was a trade secret. In other words, plaintiff has demonstrated a <u>possibility</u> of success on that issue. However, defendants' evidence to the contrary—particularly their showing that plaintiff failed to take reasonable steps to maintain the secrecy of its process—precludes the court from finding that plaintiff has shown a <u>probability</u> of success.

Beyond the mere existence of trade secrets, plaintiff has shown a possibility of success on its claim that Bell misappropriated trade secrets by improperly retaining Nucor documents. As to SeverCorr, plaintiff has not shown a likelihood of success on the trade secrets claim because it has not produced enough evidence to show that SeverCorr has misappropriated or used Nucor's trade secrets. Finally, plaintiff has not shown a likelihood of success on the merits as to its claim that defendants misappropriated trade secrets by soliciting its employees.

With respect to the non-trade secret claims, plaintiff has demonstrated the same likelihood of success on the breach of contract claim as it has on the trade secrets claim. The breach of contract, as discussed above, is largely derivative of the trade secrets claim. Also for the reasons discussed above, plaintiff has not shown a likelihood of success on the merits on its tortious interference or unfair trade practices claims.

**B.** **Inevitable Disclosure**

Plaintiff contends the inevitable disclosure doctrine supports granting its request for preliminary relief. In the usual inevitable disclosure case, the plaintiff has an employee who knows its trade secrets who later accepts a position with the plaintiff's direct competitor. If the plaintiff can show that its former employee will necessarily have to disclose or use its trade secrets to carry out the duties of his new position, then the plaintiff is entitled to relief enjoining the employee from working for the competitor. The plaintiff can obtain that relief even in the absence of a non-compete agreement. See PepsiCo, Inc. v. Redmond, 54 F.3d 1262 (7th Cir. 1995); Keith A. Roberson, Comment, South Carolina's Inevitable Adoption of the Inevitable Disclosure Doctrine: Balancing Protection of Trade Secrets with Freedom of Employment, 52 S.C. L. Rev. 896, 897 (2001).

**1.** **Whether South Carolina Would Apply the Doctrine**

The South Carolina courts have not addressed whether the inevitable disclosure doctrine applies in this state. If the applicable state law is unclear, the federal courts must predict how that state's highest court would rule on the issue. Wells v. Liddy, 186 F.3d 505, 527-28 (4th Cir. 1999). "In predicting a decision of the state's highest court," the district court can consider, inter alia, "canons of construction, restatements of the law and treatises that are regularly applied by the courts of the state and who use for a particular purpose is approved by the state's highest court, recent pronouncements of general rules or policies by the state's highest court, or even that court's well considered dicta." Liberty Mut. Ins. Co. v. Triangle Industries, Inc., 957 F.2d 1153, 1156 (4th Cir. 1992)

(internal citations omitted).

The SCTSA provides for injunctive relief to prevent the "actual or threatened misappropriation" of trade secrets. S.C. Code Ann. § 39-8-50(A) (emphasis added). Including South Carolina, forty-two states and the District of Columbia have adopted statutes that permit enjoining the threatened misappropriation of trade secrets. See Brandy L. Treadway, Comment, An Overview of Individual States' Application of Inevitable Disclosure: Concrete Doctrine or Equitable Tool?, 55 SMU L. Rev. 621, 625-26 (2002); Roberson, supra, at 900. State or federal courts in at least fifteen of those states—and in six states that have not adopted statutes like South Carolina's—have applied the inevitable disclosure doctrine.[36] Only two states' appellate courts have rejected the doctrine. See Whyte v. Schlage Lock Co., 125 Cal. Rptr. 2d 277, 291 (Ct. App. 2002); LeJeune v. Coin Acceptors, Inc., 849 A.2d 451, 471 (Md. 2004).[37] The remaining states have not considered the issue yet.[38] Thus, the majority of states to address the issue have applied the inevitable disclosure doctrine in some form, which is one factor the South Carolina Supreme Court frequently considers in recognizing or

---

[36]See Roberson, supra, at 901-02. The court has conducted its own research to update Roberson's statistics.

[37]A Virginia trial court has noted that the state would likely not recognize the doctrine. See Gov't Tech. Servs., Inc. v. Intellisys Tech. Corp., 51 Va. Cir. 55 (1999).

[38]A federal district court in Florida refused to apply the doctrine because the Florida state courts had not expressly adopted the doctrine (even though they had not expressly rejected the doctrine either). See Del Monte Fresh Produce Co. v. Dole Food Co., 148 F. Supp. 2d 1326, 1337 (S.D. Fla. 2001). Although South Carolina has not addressed the issue, refusing to apply the doctrine simply because it has not been adopted by the forum state is a disfavored approach under the Fourth Circuit's opinions in Wells and Liberty Mutual.

rejecting legal doctrines. Cf. Hendricks v. Clemson University, 353 S.C. 449, 457, 578 S.E.2d 711, 715 (2003) (looking to the majority of states in rejecting an educational malpractice cause of action); Russo v. Sutton, 310 S.C. 200, 203, 422 S.E.2d 750, 753 (1992) (looking to the majority of states in rejecting the criminal conversation and alienation of affection causes of action); Ludwick v. This Minute of Carolina, Inc., 287 S.C. 219, 219, 337 S.E.2d 213, 216 (1985) (looking to the majority of states in recognizing the wrongful termination in violation of public policy cause of action).

South Carolina disfavors restraints on trade as a matter of public policy. See Standard Register Co. v. Kerrigan, 238 S.C. 54, 119 S.E.2d 533, 536 (1961); Reeves v. Sargeant, 200 S.C. 494, 21 S.E.2d 184, 187-88 (1942); Carolina Chem. Equip. Co. v. Muckenfuss, 322 S.C. 289, 292-93, 471 S.E.2d 721, 723 (Ct. App. 1996). Despite that public policy, the South Carolina courts generally permit restraints on trade (i.e., non-competition agreements) that are narrowly tailored to protect the employer's legitimate business interests. See Almers v. S.C. Nat'l Bank of Charleston, 265 S.C. 48, 58, 217 S.E.2d 135, 140 (1975); Faces Boutique, Ltd. v. Gibbs, 318 S.C. 39, 42 455 S.E.2d 707, 708 (Ct. App. 1995). Thus, the public policy disfavoring restraints on trade is not a wholesale prohibition on those restraints; rather, public policy influences state court decisionmaking by ensuring restraints on trade receive meaningful scrutiny.

Courts in other states have applied the inevitable disclosure doctrine despite their public policy disfavoring restraints on trade. In Essex Group, Inc. v. Southwire Co., 501 S.E.2d 501 (Ga. 1998), the Georgia Supreme Court affirmed an injunction issued on an inevitable discovery theory that prohibited the plaintiff's former employee from

continuing to work for its direct competitor. Id. at 504-05 & n.3. In Cardinal Freight

Carriers, Inc. v. J.B. Hunt Transport Services, Inc., 987 S.W.2d 642 (Ark. 1999), the

Arkansas Supreme Court recognized the doctrine and applied it to affirm an injunction

that limited the former employee's job responsibilities while working for the plaintiff's

competitor. See id. at 645-47. Like South Carolina, both Georgia and Arkansas have

expressed public policies disfavoring restraints on trade and non-competition agreements.

See Statco Wireless, LLC v. SW Bell Wireless, LLC, 95 S.W.3d 13, 16 (Ark. 2003);

W.R. Grace. & Co. v. Mouyal, 422 S.E.2d 529, 531 (Ga. 1992).

California, which has rejected the inevitable discovery doctrine (along with

Maryland), takes an especially aggressive stance against restraints on trade: "Every

contract by which anyone is restrained from engaging in a lawful profession, trade, or

business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600. Non-

compete agreements are therefore void in California—even those with "reasonable

restraints" that would be enforceable in states like South Carolina that follow the

common law rule. See Alliance Payment Sys., Inc. v. Walczer, 61 Cal. Rptr. 3d 789, 802

(Ct. App. 2007). Kelton v. Stravinski, 41 Cal. Rptr. 3d 877, 881 (Ct. App. 2006). The

California courts have taken that strong public policy and extended it to the inevitable

disclosure doctrine, reasoning that applying the doctrine creates a "de facto covenant not

to compete." Whyte, 125 Cal. Rptr. 2d at 292-93.[39]

---

[39]The Maryland Supreme Court looked to Whyte to reject the doctrine, reasoning
that Maryland's public policy was similar to California's (although a closer look at
Maryland case law indicates that reasonable non-compete agreements are enforceable
there). LeJeune, 849 A.2d at 471. The Maryland Supreme Court also frowned upon the
doctrine's after-the-fact nature. See id.

The court acknowledges that there is little guidance from South Carolina courts. Nonetheless, the court believes that the South Carolina Supreme Court would recognize the inevitable disclosure doctrine. First, S.C. Code Ann. § 39-8-50 allows injunctions in cases presenting threatened misappropriation of trade secrets. The inevitable disclosure doctrine is a common-sense tool for determining when misappropriation is likely to occur. Second, most states to address the issue have chosen to apply the doctrine in some form, and South Carolina commonly chooses to follow the majority rule in addressing new legal doctrines. Third, other states have applied the doctrine even though they, like South Carolina, have expressed policy interests that disfavor restraints on trade. Finally, California, the primary state to reject the doctrine, has an unusually strong public policy against restraints on trade. South Carolina does not take such a rigid position against restraints on trade.

### 2.      How to Apply the Doctrine

Naturally, the next question is what form the doctrine would take in South Carolina. Courts frequently look to the Seventh Circuit's decision in PepsiCo to formulate their versions of the inevitable disclosure doctrine, e.g., Merck & Co. v. Lyon, 941 F. Supp. 1443, 1460 (M.D.N.C. 1996); CMI Int'l, Inc. v. Intermet Int'l Corp., 649 N.W.2d 808, 813-14 (Mich. Ct. App. 2002), and PepsiCo is generally recognized as a leading case on the doctrine. Accordingly, the court's application of the inevitable disclosure doctrine in the instant case begins with PepsiCo.

Like many inevitable disclosure cases, PepsiCo involved three parties: PepsiCo (the former employer), Redmond (the employee), and Quaker Oats (the new employer).

36

See PepsiCo, 54 F.3d at 1263-65. Redmond worked as general manager of PepsiCo's California unit, a high-level position in which he oversaw an operation with $500 million in annual revenue that produced 20% of PepsiCo's United States profits. Id. at 1264. In that position, Redmond obtained knowledge of PepsiCo's confidential information, namely its strategic plans, pricing methods,"attack plans" for particular markets, and delivery systems. Id. at 1264-66. Although Redmond had signed a confidentiality agreement, PepsiCo did not have the benefit of a non-compete agreement. See id. Quaker Oats, which directly competed with PepsiCo in the important sports and "new age" drink markets, began courting Redmond and offered him the position of Vice President Field Operations for its Gatorade product. Id. at 1264. Even after Redmond accepted the offer, he continued to represent to PepsiCo that he was still only considering the offer. Apparently relying on that misrepresentation, PepsiCo sent Redmond on customer visits. Id. A few days later, Redmond resigned from PepsiCo and informed it that he had accepted a position at Quaker. Id. at 1264-65. PepsiCo then sued Redmond and Quaker alleging misappropriation of trade secrets in violation of the Illinois Trade Secrets Act. Id. at 1265, 1267.

PepsiCo moved for a preliminary injunction. It argued that Redmond's new position would inevitably require him to disclose PepsiCo's trade secrets, specifically because Redmond "would have substantial input as to [Quaker's] pricing, costs, margins, distribution systems, products, packaging and could give Quaker an unfair advantage in its upcoming skirmishes with PepsiCo." Id. at 1266. Quaker argued that Redmond would only be involved in the execution of a pre-existing plan for the marketing and distribution

of its products. Quaker also argued that Redmond's knowledge of PepsiCo's trade secrets was irrelevant because the two companies had different distribution systems. Id. PepsiCo countered by showing evidence that Redmond would have significant influence in his new position in addition to playing a possible role in re-developing Quaker's plans, meaning that he would be developing Quaker's strategic plans while having PepsiCo's secrets "in mind." Id. In sum, PepsiCo argued that Redmond's high policy-making position at Quaker meant that he would be influenced by his knowledge of PepsiCo's trade secrets while formulating plans for a direct competitor. See id. at 1267-68. The district court accepted PepsiCo's arguments and issued a preliminary injunction that prohibited Redmond from working for Quaker. Id. at 1268.

On appeal to the Seventh Circuit, the parties agreed that PepsiCo's information constituted "trade secrets," leaving only a question of whether PepsiCo showed a likelihood of success as to the misappropriation of its trade secrets. See id. at 1267-68. The Seventh Circuit then proceeded with an analysis of the inevitable disclosure doctrine. The court held that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." Id. at 1269. In affirming the district court's injunction, the Seventh Circuit first noted that there was evidence that Redmond had "extensive and intimate knowledge" of PepsiCo's trade secrets. Id. The Seventh Circuit paid particular attention to the district court's reasoning that "unless Redmond possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about [Quaker's products] by relying on his knowledge of PepsiCo's trade secrets." Id. The

court was also concerned with the fact that Redmond would be in a position to plot Quaker's strategy against PepsiCo while knowing the latter's trade secrets. See id. at 1270 ("In other words, PepsiCo finds itself in the position of a coach, one of whose players left, playbook in hand, to join the opposing team before the big game.") Also important in the Seventh Circuit's decision was the district court's conclusion that Redmond's actions in accepting his new employment demonstrated a lack of candor and served as proof of a willingness to misuse PepsiCo's trade secrets. Id. at 1270-81.

A close analysis of PepsiCo reveals at least six factors a court should consider before applying the inevitable disclosure doctrine: (1) whether the former employer possesses a "trade secret," (2) the employee's position at his former employer; (3) whether the employee possesses an "extensive and intimate knowledge" of his former employer's trade secrets; (4) the degree to which the employee's former employer and new employer are in competition; (5) whether the employee can effectively perform the duties of his new position without disclosing, using, or relying on his former employer's trade secrets; (6) whether there are other circumstances that indicate the employee or his new employer are unable or unwilling to safeguard the former employer's trade secrets. Id. at 1270-72.

Defendants argue that the court should be careful to apply PepsiCo narrowly. One district court has noted that PepsiCo involved "extreme facts" because there was evidence that the employee acted in bad faith. See Dearborn v. Everett J. Prescott, Inc., 486 F. Supp. 2d 802, 820 (S.D. Ind. 2007). Commentators have criticized courts for failing to limit PepsiCo to its facts. See, e.g., Roger M. Milgrim, Milgrim on Trade

Secrets, § 5.02[3][d], at 5-61 to -65 (2006); Jennifer L. Saluino, Locating Inevitable Disclosure's Place in Trade Secret Analysis, 100 Mich. L. Rev. 1184, 1209-14 (2002). Recognizing the need to apply the doctrine narrowly in light of the potentially harsh effects on the employee, courts have reasoned that it should only be applied when there is evidence of bad faith by the employee, see Dearborn, 486 F. Supp. 2d at 820, in cases involving technical trade secrets, see Int'l Paper Co. v. Suwyn, 966 F. Supp. 246, 258-59 (S.D.N.Y. 1997), or when there is evidence that actual misappropriation has occurred, see See Earthweb, Inc. v. Schlack, 71 F. Supp. 2d 299, 310 (S.D.N.Y. 1999); Marietta Corp. v Fairhurst, 754 N.Y.S.2d 62, 65-66 (App. Div. 2003).

South Carolina would likely apply a narrow version of the inevitable disclosure doctrine because of its public policy disfavoring restraints on trade. However, it is not necessary to define the precise contours because, as discussed below, this case warrants injunctive relief under even the most narrow application of the doctrine.

### 3. Application of the Doctrine in This Case

For the reasons discussed above, plaintiff has shown a possibility of success on the merits insofar as it must show that its process, or parts of its process, for manufacturing IF/ULC steel is a trade secret. The parties in this matter do not dispute that Bell had "extensive and intimate knowledge" of plaintiff's alleged trade secrets; their primary dispute is whether that information qualifies as a trade secret at all. Moreover, there is not a substantial dispute that Nucor and SeverCorr will eventually be direct competitors in the unexposed automotive steel industry.[40] Finally, by his own admission,

---

[40]Defense counsel has represented to the court that "SeverCorr does intend to produce automotive unexposed, as well as exposed steel." Letter from defense counsel to

Bell had significant authority in his position as Melt-Shop Manager at Nucor-Berkeley and was largely responsible for the development of plaintiff's IF/ULC steelmaking process.

The more difficult questions concern the fifth and six factors. There is considerable evidence and the court finds that Bell will necessarily use and rely on his knowledge of plaintiff's trade secrets in order to perform his duties at SeverCorr. SeverCorr is clear that it intends (and that its financing requires it) to produce IF/ULC steel using its vacuum degasser. Certainly SeverCorr will take advantage of the knowledge and experience Bell can provide as it proceeds in the vital task of producing IF/ULC steel.[41] As General Manager and Executive Vice President, Bell has direct managerial responsibility over the melt shop and part of his duties certainly include overseeing the production of IF/ULC steel. Although Bell testified that SMS Demag gave guarantees and that producing IF/ULC steel is a matter of chemistry, he agreed that he was going to do what he could to assist the process. See PI Hrg. Tr. at 498-99. Pole testified that he has sought Bell's advice before, particularly when there are issues with certain heats. See Pole Dep. II at 110. Indeed, Bell's employment agreement with SeverCorr will pay him $5 million bonus only if the mill produces IF/ULC steel in a set

the court (Sept. 14, 2007).

[41]A case could be made that SeverCorr hired Bell because of his knowledge of Nucor's IF/ULC process. Bell is a steelmaker and a good one, but there is no evidence that Bell has any experience in building a steel plant or running one. Why a start-up company would entrust a man with Bell's managerial experience with a $1 billion investment is curious. Why a start-up company whose financing requires that it produce IF/ULC steel would hire the melt-shop manager of the first (and only) mini-mill to produce IF/ULC steel on a commercial basis is readily apparent.

timeframe–strong evidence that Bell was hired to produce IF/ULC steel. <u>See</u> <u>id.</u>

As SeverCorr begins the process of producing IF/ULC steel, it is difficult to see how Bell could be involved without using or relying on his extensive knowledge of Nucor's trade secrets—he knows what works and, just as importantly, what does not work. Even accepting SeverCorr's contention that it will learn all it needs to know from SMS Demag, SeverCorr's expert, its melt-shop manager, and Bell all agree that it will have to work to perfect its process. <u>See</u> PI Hrg. Tr. at 498-99, 519; Pole Dep. I at 111.Any time Bell participates in the IF/ULC steelmaking process, regardless of whether he directs the process or merely assists in troubleshooting, his input will necessarily incorporate his intimate knowledge of plaintiff's purported trade secrets. Like the employee in <u>PepsiCo</u>, the only way Bell would be able to disregard the information he learned through his efforts at Nucor-Berkeley is if he possesses an "uncanny" ability to compartmentalize information. Moreover, Bell will have the assistance of some of the same employees who helped him develop the process at Nucor-Berkeley, which would make it even more difficult for Bell to oversee the process without using plaintiff's trade secrets. There is an obvious line between an employee's skills and experience (which are not trade secrets) and the confidential information an employee learns in the course of his employment (which may be trade secrets). However, this case involves more than Bell's skill and experience; Bell has extensive, intimate knowledge of Nucor's successes and its failures on the road to its production of IF/ULC steel, and his participation in the process at SeverCorr will necessarily disclose that knowledge.

There are also circumstances demonstrating defendants' unwillingness or inability

to safeguard Nucor's purported trade secrets. Bell took Nucor documents after he knew he was going to work for SeverCorr and plaintiff has shown a possibility of succeeding to the extent its trade secrets claim relies on those events. Thus, plaintiff has some evidence that Bell already misappropriated its trade secrets. More importantly, the court has already concluded in connection with the motion for sanctions that Bell acted in bad faith by throwing away the SanDisk thumb-drive containing documents with Nucor's potential trade secrets. See Dearborn, 486 F. Supp. 2d at 820 (stating that inevitable disclosure "should be limited to a rare and narrow set of circumstances in which the departing employee has acted in bad faith"). Beyond Bell's bad faith spoliation, the court has also found that SeverCorr engaged in intentional spoliation (though not in bad faith). The presence of spoliation supports a finding that the circumstances as a whole warrant application of the inevitable disclosure doctrine.

This case presents a classic inevitable disclosure scenario. In the course of rejecting the doctrine, the Maryland Supreme Court provided an apt summary of early cases discussing inevitable disclosure: "Long before the adoption of the Uniform Act, the first reported cases applying 'inevitable disclosure' involved extraordinary situations in which a company tried to guard the secrecy of some technology that had propelled the company into industry leadership." LeJeune, 849 A.2d at 469; accord Interbake Foods, L.L.C. v. Tomasiello, 461 F. Supp. 2d 943, 972 (N.D. Iowa 2006) (noting that the courts generally grant relief using the doctrine in cases where an employee has knowledge that would allow a competitor to improve its business with little or no effort or when the competitors are attempting to produce similar products). This case fits neatly into those

descriptions of inevitable disclosure, further supporting the doctrine's application here.

For the reasons set forth above, the court concludes that portions of Bell's employment at SeverCorr dealing with IF/ULC steel production will require him to inevitably disclose plaintiff's purported trade secrets.

**C.** **The Relative Harms**

  **1.** **Risk of Irreparable Harm to Plaintiff**

Plaintiff asserts that, in the absence of injunctive relief, it will suffer irreparable harm in two ways. First, plaintiff argues that the threatened or actual misappropriation of its trade secrets constitutes <u>per</u> <u>se</u> irreparable harm. Second, plaintiff argues that it will be irreparably harmed if SeverCorr is permitted to manufacture and sell IF/ULC steel because it will suffer a loss of customers, goodwill, and competitive advantage.

"'Irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.'" <u>Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.</u>, 22 F.3d 546, 551 (4th Cir. 1994) (quoting <u>Danielson v. Local 275</u>, 479 F.2d 1033, 1037 (2d Cir. 1973)). The loss of even a single trade secret is irreparable harm, and the threatened disclosure of a trade secret supports the imposition of injunctive relief. <u>N. Atl. Instruments, Inc. v. Haber</u>, 188 F.3d 38, 49 (2d Cir. 1999); <u>FMC Corp. v. Varco Int'l, Inc.</u>, 677 F.2d 500, 503 (5th Cir. 1982). The loss of a trade secret is irreparable harm and difficult to measure in monetary damages because "[a] trade secret lost is, of course, lost forever." <u>FMC Corp. v. Taiwan Tainan Giant Indus. Co.</u>, 730 F.2d 61, 62 (2d Cir. 1984). In some circumstances, the loss of a trade secret can lead to other irreparable harms, including loss of goodwill and reputation. <u>See</u> <u>Multi-Channel</u>, 22 F.3d

at 552.

Plaintiff has demonstrated a possibility that it has trade secrets and that Bell misappropriated those secrets. Proof that trade secrets have already been misappropriated gives rise to a presumption of irreparable harm. E.g., Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc., 323 F. Supp. 2d 525, 533 (S.D.N.Y. 2004); Merck & Co., Inc. v. Lyon, 941 F. Supp. 1443, 1455 (M.D.N.C. 1996); Picker Int'l Corp. v. Imaging Equip. Servs., Inc., 931 F. Supp. 18, 44 (D. Mass. 1995). Additionally, Bell's position at SeverCorr will cause him to disclose or use plaintiff's trade secrets, so plaintiff has also demonstrated threatened irreparable harm in light of the inevitable disclosure doctrine. The threatened harm is also imminent because SeverCorr is moving beyond the construction phase and is moving into the actual production (or attempted production) of IF/ULC steel—a process that poses the greatest risk of disclosing plaintiff's alleged trade secrets.[42]

Plaintiff makes an amorphous argument that it will suffer a loss of reputation because it will no longer be the only mini-mill in the world that produces IF/ULC steel on a commercial basis if SeverCorr uses Nucor's trade secrets to accomplish that goal. Plaintiff has not shown any actual harm with respect to that argument. There is no evidence that plaintiff enjoys a special advantage in the market place simply because it was the first mini-mill to produce the product. Rather, the evidence demonstrates IF/ULC steel is a fungible good and, as long as the customer's specifications are met, the

---

[42]Plaintiff's potential loss of customer relationships and goodwill does not entitle it to separate injunctive relief. The irreparable harm caused by the threatened misappropriation of plaintiff's trade secrets accounts for the harm that may stem from those wrongful acts. In this case, that residual harm includes a loss of plaintiff's existing business relationships and goodwill.

customer will purchase the steel from whomever has the lowest price. The notion that customers will purchase IF/ULC steel at the lowest possible cost, without regard to brand, is the entire basis of plaintiff's argument that it enjoys a competitive advantage over integrated mills and the reason it wants to prevent SeverCorr from intruding on its market-share. This argument therefore does not support additional injunctive relief.

### 2.     Risk of Harm to Defendants

The harm defendants will suffer from the issuance of injunctive relief varies depending on what form that relief takes. As noted above, plaintiff requests an injunction that prohibits: (1) Bell from working for SeverCorr; (2) SeverCorr from manufacturing, or preparing to manufacture, ultra low carbon (ULC) or interstitial free (IF) steel by use of a vacuum degasser and/or quench process; (3) SeverCorr from hiring employees of Nucor's Berkeley County, South Carolina plant, or from any other Nucor sheet mill operation; and (4) defendants from using, disclosing, or otherwise misappropriating Nucor trade secrets and confidential information.

Defendants will suffer significant harm from an injunction prohibiting Bell from working at SeverCorr. As to Bell, that would entail the termination of his current employment until this litigation ends. Bell is sixty-six years old, which would make it difficult for him to find other employment. Even if Bell finds another job, it will come at a high financial and personal burden, in addition to the harm that comes from the transition between jobs.[43] As to SeverCorr, defendants have presented evidence that it

---

[43]Defense counsel aptly noted another reason why it would be difficult for Bell to find alternative employment: "The reality is that with the breadth of trade secrets that [plaintiff] has claimed in this case, who would want to take the risk of hiring Mr. Bell and incur the wrath of Nucor?" PI Hrg. Tr. at 44.

would be harmed if Bell cannot work as its General Manager and Executive Vice President. Edward Lehner, SeverCorr's CFO, elaborated on the harm his company will suffer if Bell cannot work there:

> After being with the company for 14 months [now approximately 20 months], I mean, John has had a chance to assemble his team. He has been involved in training with the vendors. He has been involved with, you know, the creation fo the processes and systems. He familiar with the entire project.
>
> You know, SeverCorr, being that it's a billion dollar project finance, it's complex. And when you are in a startup, startups are very fragile. And you really depend on—you depend on that distribution. Well, first of all, the assimilation of knowledge once you get into a new organization, but then how you distribute that out.
>
> So to me, if you unplug John from that now, you know, I think it would be a disasterous blow to SeverCorr.

PI Hrg. Tr. at 340-41. There are good reasons to believe Lehner's description of the effects "unplugging" Bell would have. SeverCorr is a complex operation, involving hundreds of employees and countless relationships with third-party vendors, customers, and financiers. Moreover, Bell has responsibilities at SeverCorr that extend far beyond the manufacturing of IF/ULC steel, or even the operation of the mill's melt shop. He has overseen the day-to-day construction and operation of the entire mill, and replacing him with someone else would certainly disrupt SeverCorr's operations. For those reasons, the court concludes that the balance of harms with respect to the request to enjoin Bell's further employment at SeverCorr does not tip toward either party. Assuming the worst-case scenario for plaintiff, it may lose a portion of its business; Bell would lose his livelihood and SeverCorr would lose an important resource.

SeverCorr will also suffer significant harm if it is enjoined from manufacturing or

preparing to manufacture IF/ULC steel. Plaintiff argues that IF/ULC steel is only a portion of the products SeverCorr will produce, thereby causing little harm if it cannot sell that product. However, defendants have offered substantial evidence to show that SeverCorr's loans include default and acceleration clauses that depend on the mill's ability to produce IF/ULC steel. As Lehner testified, the plant has to perform a final acceptance test by the fortieth month of the construction process. The final acceptance test includes the production of automotive exposed-grade steel. In June 2007, the mill was in its twenty-first month of construction. Thus, the plant now has less than twelve months to produce automotive grade steel. Failure to pass that test is an act of default under SeverCorr's financing agreements and its lenders could choose to accelerate loans totaling $600 to $700 million. PI Hrg. Tr. at 342-43. Lehner testified that obtaining that much financing "would be a very difficult thing to do" and there is a high likelihood that SeverCorr could not restructure those loans. Id. at 343. Accordingly, an injunction that prohibits the manufacturing of IF/ULC steel would have negative effects on SeverCorr's financing and jeopardize its existence. Moreover, any delay in preparing to manufacture IF/ULC steel would be harmful because of the strict schedule SeverCorr must follow for completing the final acceptance test. For those reasons, the court concludes the balance of harms with respect to the request to enjoin SeverCorr's production or preparation to produce IF/ULC tips toward SeverCorr. Plaintiff will not go out of business if SeverCorr makes and sells IF/ULC steel, whereas SeverCorr has shown that it may be unable to carry on operations or placed in an unwarranted risk of such harm if that relief is

granted.[44]

**D.      The Public Interest**

In most cases, the public interest factor does not favor either party. Rum Creek, 926 F.2d at 366. For that reason, "[t]he public interest factor does not always appear to be considered at length in preliminary injunction analyses." Id. Federal, state, and local governments have provided significant investment in the SeverCorr mill. SeverCorr also employs hundreds of people and countless others have business relationships with the mill. Similarly, plaintiff's Nucor-Berkeley facility provides substantial economic benefits to this community and employs hundreds of people. Nucor Corp. is a large corporation and likewise provides economic benefits to communities throughout the United States. To the extent the public interest factor affects this case, it favors injunctive relief that strikes a balance between the parties' legitimate business interests and, consequently, considers the economic well-being of those who rely on them.

**E.      Fashioning the Appropriate Relief**

The relief plaintiff has requested is not appropriate in light of the Blackwelder factors. Plaintiff has requested that the court enjoin Bell from working at SeverCorr. The balance of harms as to this particular request is in equipoise, meaning the plaintiff must

---

[44]Plaintiff argues the court should discount defendants' claimed harm because they have failed to prepare for the possible grant of preliminary relief. See Oct. 7, 2007 Hrg. Tr. at 94-95, 98. In assessing the risk of harm, "the real issue . . . is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied." Scotts Co., 315 F.3d at 284. Any argument that defendants' harms should be given less weight because they are "self-inflicted" wrongly assumes that injunctive relief is proper in this case (in other words, the argument assumes that plaintiff will prevail on the merits). See id. at 285. For that reason, a district court errs when it discounts a defendant's "self-inflicted" harms. Id.

make a stronger than usual showing of success on the merits. Likewise, plaintiff has requested that the court enjoin SeverCorr from manufacturing or preparing to manufacture IF/ULC steel. The court concluded that the balance of harms with respect to that risk tips slightly in favor of defendants. For those two requests, raising fair grounds or substantial questions for litigation is not enough. Instead, plaintiff, at a minimum, had to demonstrate a probability (as opposed to a possibility) of success on the merits, also described a "clear showing" of a likelihood of success. See Direx, 952 F.2d at 808, 813; Scotts Co., 315 F.3d at 271. Trying to ascribe meaning to that standard is difficult, but plaintiff must do more than simply show a chance of prevailing on the merits or even that it has roughly the same chance of prevailing as defendants. Indeed, the use of the term "probable" implies that plaintiff must show it is more likely than not going to succeed on the merits. Plaintiff has not made such a showing in this case because both parties have equally strong likelihoods of succeeding on the trade secrets claims.

Plaintiff has also requested that the court enjoin SeverCorr from hiring certain Nucor employees. Although the balance of harms tips in plaintiff's favor as to this relief, plaintiff has failed to show any likelihood of succeeding on the merits of the claims relating to solicitation of its former employees. Finally, plaintiff has requested that the court enjoin defendants from misappropriating, using, or disclosing its trade secrets. Although the balance of harms tips towards plaintiff on this request and plaintiff has shown some likelihood of success on the merits, the court concludes this requested relief is unnecessary. Defendants are already under a legal obligation not to misappropriate

plaintiff's trade secrets, which includes use or disclosure. <u>See</u> S.C. Code Ann. §§ 39-8-20, -40.

Nonetheless "a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case." <u>See</u> <u>Richmond Tenants Org., Inc. v. Kemp</u>, 956 F.2d 1300, 1308 (4th Cir. 1992) (citing <u>Lemon v. Kurtzman</u>, 411 U.S. 192, 200 (1973)). Plaintiff is entitled to some injunctive relief in this case to protect the potential misappropriation of its trade secrets before trial. This is best served by an injunction that permits Bell to continue his employment at SeverCorr but that bars him from any involvement in manufacturing or preparing to manufacture IF/ULC steel. Plaintiff has demonstrated a likelihood of irreparable harm because of the application of the inevitable disclosure doctrine in this case in addition to the possibility that Bell actually misappropriated trade secrets. In contrast, defendants will suffer little, if any, harm from such an injunction. Defendants have maintained throughout this litigation that SMS Demag provided all of the equipment and know-how required to produce IF/ULC steel. They have further argued that Bell has had only limited involvement in the planned production of IF/ULC steel. It is therefore reasonable to infer that defendants will not suffer much harm from his non-involvement in that process until the resolution of this case. Accordingly, the balance of the harms tips in favor of plaintiff, which means its showing of success on its trade secrets claim supports the injunctive relief.

Taken to a logical extreme, one could say many of Bell's activities as General Manager and Executive Vice President contribute to SeverCorr's aspirations of producing IF/ULC steel. This is particularly true in Bell's dealings with the melt shop

and CSP caster. The court is not enjoining all of Bell's involvement with all steelmaking at SeverCorr. Rather, the injunction only prohibits Bell from participating in tasks that are unique to or specifically involve the production of IF/ULC steel. Nonetheless, the injunction prohibits, _inter alia_, Bell from discussing the manufacturing of IF/ULC steel with other SeverCorr employees or anyone involved in SeverCorr's production of IF/ULC steel.

**F.      Security Bond**

"No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper . . . ." Fed. R. Civ. P. 65(c). Rule 65(c) is "mandatory and unambiguous": A district court must fix a bond whenever it grants a preliminary injunction. Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 (4th Cir. 1999). Despite the parties' otherwise thorough arguments, they have failed to present any argument on the appropriate amount of security. Their lack of concern with the amount of security leads to the conclusion that a small or nominal amount of security will suffice. See id. at 421 n.3 ("In some circumstances, a nominal bond may suffice.") Accordingly, the court orders plaintiff to post a security bond in the amount of $500.

### V. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that plaintiff's motion for a

preliminary injunction be **GRANTED** in part. It is further **ORDERED** that:

1)      John Bell is **ENJOINED** from involvement in SeverCorr's manufacturing of, or

its preparation for manufacturing, interstitial free and ultra low carbon steels; and

2)      SeverCorr is **ENJOINED** from utilizing Bell's services in the manufacturing of,

or its preparation for manufacturing, interstitial free and ultra low carbon steels.

Plaintiff shall post a security bond pursuant to Rule 65(c) in the amount of $500.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

**March 14, 2008**
**Charleston, South Carolina**